**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| COURTNEY HLADIK, | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 4:25-cv-148 |
| CREDIT KARMA, LLC, | : | |
| Defendant. | : | |

## CLASS ACTION COMPLAINT

Plaintiff Courtney Hladik, by counsel, states as follows for her Class Action Complaint against Defendant Credit Karma, LLC.

## PRELIMINARY STATEMENT

1. In 1970, Congress enacted the Fair Credit Reporting Act to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy. *See* 84 Stat. 1128, 15 U.S.C. § 1681; *see also Guimond v. Trans Union Credit Info.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (explaining that the FCRA was enacted "to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner" (citations omitted)).

2. One of the FCRA's primary protections is the requirement that access to a consumer's private credit information is restricted to those with a legitimate reason to access that information. *See* 15 U.S.C. § 1681b(a) and (f). To this end, Congress included in the FCRA an elaborate set of interlocking provisions that restrict the access to and dissemination of consumer reports. *See, e.g.*, 15 U.S.C. § 1681b(a) (permissible purpose); 15 U.S.C. § 1681e(a)

(certification of permissible purpose); 15 U.S.C. § 1681b(f) (user's certification of permissible purpose).

3. Unfortunately, Ms. Hladik did not receive the benefits of this protection. Instead, Credit Karma impermissibly accessed Ms. Hladik's Equifax, Experian and Trans Union credit reports and then provided it to an unauthorized user.

4. Unbeknownst to Ms. Hladik, her ex-husband set up a Credit Karma account to monitor her financial information after their separation and during their divorce proceedings. The account was created using her ex-husband's email address, and all notifications and access were done through his email.

5. Over the years, her ex-husband accessed her credit information hundreds of times. Each time, Credit Karma requested and received Ms. Hladik's credit reports from one or more of the major consumer reporting agencies and then provided that information to Ms. Hladik's ex-husband—without any safeguards in place to make sure only an authorized individual was receiving her credit information.

6. And, when Ms. Hladik informed Credit Karma that she had never created a Credit Karma account or ever used the Credit Karma platform, Credit Karma continued to allow her ex-husband to access her private credit information.

7. Because Credit Karma's procedures for granting access to consumer credit reports are the same and, upon information and belief, allowed many unauthorized users to gain access to consumer reports, Ms. Hladik brings her claims on a class basis.

8. As a result, Ms. Hladik alleges class claims against Credit Karma under: (1) 15 U.S.C. § 1681b(a) for providing her and the putative class members' credit information to unauthorized users without a permissible purpose; (2) 15 U.S.C. § 1681b(f) for accessing Ms.

Hladik's and the putative class members' credit information without a permissible purpose; and (3) 15 U.S.C. § 1681e(a) for failing to maintain reasonable procedures to limit to furnishing of consumer reports to the purposes listed under §1681b.

**JURISDICTION**

9. This Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 168l(p).

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Hladik's claims occurred in this District, where she resides.

**PARTIES**

11. Ms. Hladik is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

12. Credit Karma is a Delaware limited liability company with a principal place of business in Oakland, California. Credit Karma is a "consumer reporting agency" and a "reseller" as defined by 15 U.S.C. §§ 1681a(f) and 1681a(u).

**FACTS**

*Credit Karma's Business Model*

33. Credit Karma advertises itself to consumers as "an app that always has your back." https://www.creditkarma.com/about/howitworks (last visited Nov. 6, 2025).

34. Credit Karma offers a servicer that allows a user to gain unlimited access to their credit reports. *Id.*

35. After they have signed up, Credit Karma also monitors a consumer's credit report daily and sends them an alert when there is any major change to their credit report. *Id.*

36. Credit Karma does not offer consumers a fee for this service. Instead, it uses the information that it receives about consumers to send them targeted financial offers from banks

and lenders. When a consumer signs up for a financial product through Credit Karma's website, the bank or lender pays Credit Karma a commission. *Id.*

37. Credit Karma's business model is highly profitable—it reported revenues of $1.7 billion in 2024. https://investors.intuit.com/sec-filings/all-sec-filings/content/0000896878-24-000039/intu-20240731.htm (last visited Nov. 6, 2024).

38. Unfortunately for consumers, Credit Karma prioritizes its lucrative business model over ensuring that unauthorized users do not gain access to other consumers' information.

39. To open a Credit Karma account, one simply must provide an email address, name, address, last four digits of a Social Security number, and a date of birth. Once that information is provided, a Credit Karma account will be opened and Credit Karma will start providing a consumer's credit information.

40. Credit Karma does not require any documentation or other proof of identity before it starts furnishing a consumer's credit information—making it very easy for a fraudster to open a Credit Karma account and gain access to another individual's' information.

*Facts Regarding Ms. Hladik*

41. Ms. Hladik divorced her husband in October 2019.

42. In June 2024, Ms. Hladik learned that her ex-husband had created a Credit Karma account using her personal identify information after they separated and regularly checked it to monitor her financial situation.

43. Ms. Hladik has never used Credit Karma and never gave her ex-husband permission to create an account for her.

44. Ms. Hladik immediately checked her credit reports and saw that her ex-husband had accessed her credit information through Credit Karma hundreds of times—again, without her knowledge or permission.

45. Credit Karma obtained Ms. Hladik's credit information from Experian, Equifax, and Trans Union—even though it did not have Ms. Hladik's permission to do so—and then provided that information to Ms. Hladik's ex-husband, without any reasonable procedures in place to make sure that he was authorized to receive this information or that Ms. Hladik was the person who had actually opened the Credit Karma account.

46. Ms. Hladik immediately reached out to Credit Karma and informed it that she had never opened a Credit Karma account or allowed anyone to open a Credit Karma account for her.

47. Credit Karma informed her that the account had been set up using an email address that belongs to Ms. Hladik's ex-husband and that all alerts and access to the account were controlled using that email address.

48. Ms. Hladik never had access to that email address following her separation with her husband.

49. On June 3, 2024, Ms. Hladik asked Credit Karma to disable the account because it was associated with an email address that she had never used, and she did not open the account or authorized it to be opened on her behalf.

50. After she requested that Credit Karma disable the account, Credit Karma continued to allow Ms. Hladik's ex-husband to access her credit information.

51. For example, Ms. Hladik's Experian credit report shows Credit Karma inquiries on June 7, 2024, June 8, 2024, June 12, 2024, June 15, 2024, June 16, 2024, June 17, 2024, June 18, 2024, June 19, 2024 and June 20, 2024.

52. Ms. Hladik's Equifax credit report shows a Credit Karma inquiry on June 4, 2024.

53. Because of Credit Karma's conduct, Ms. Hladik has suffered actual damages, including invasion of privacy, stress, fear, anxiety, and other emotional distress.

54. Credit Karma's FCRA violations were willful. The FCRA's requirements regarding the furnishing and receiving of consumer reports only for an enumerated permissible purpose and the disclosure of a full consumer file in response to a consumer's request are well defined by the statute and the applicable case law. Credit Karma was well aware of these requirements but continued to access Ms. Hladik's credit reports from Equifax, Experian, and Trans Union and provide that information to Ms. Hladik's ex-husband. Thus, Credit Karma's FCRA violations were willful.

**COUNT ONE: VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681b(a), Class Claim**

55. Ms. Hladik restates each of the preceding allegations.

56. **The Impermissible Pull Class**. Under Fed. R. Civ. P. 23, Ms. Hladik brings this action individually and on behalf of a class initially defined as:

> All natural persons residing in the United States who (1) were the subject of a consumer report furnished by Credit Karma to a third party within five years before the filing of this action; (2) where the consumer had previously informed Credit Karma that they had not opened a Credit Karma account.

57. **Numerosity**. Ms. Hladik alleges that the Impermissible Pull Class is so numerous that joinder of the claims of all class members is impractical. Credit Karma has more than 140 million users. The names and addresses of the class members are identifiable through documents maintained by Credit Karma, and the class members may be notified of the pendency of this action by publication or mailed notice.

58. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Credit Karma had a permissible purpose to provide Ms. Hladik's and the putative class members' reports to unauthorized third parties; (b) whether this conduct constituted a violation of the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of Ms. Hladik and the putative class members.

59. **Typicality**. Ms. Hladik's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Ms. Hladik, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. § 1681b(a). This claim challenges the procedures of Credit Karma and does not depend on any individualized facts. For purposes of class certification, Ms. Hladik seeks only statutory and punitive damages. The recovery of class statutory and punitive damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but difficult to quantify. In addition, Ms. Hladik is entitled to the relief under the same causes of action as the other putative class members.

60. **Adequacy**. Ms. Hladik will fairly and adequately protect the interests of the class. She has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Ms. Hladik nor her counsel have any interests that might cause her not to vigorously pursue this action. Ms. Hladik is aware of their responsibilities to the putative class and has accepted those responsibilities.

61. Certification of the class and under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the class and subclass predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Credit Karma's conduct, using individual prosecution to obtain the statutory and punitive damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Credit Karma's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

62. Credit Karma violated 15 U.S.C. § 1681b(a) by releasing consumer reports to Credit Karma account holders that it knew or should have known were fraudulent accounts.

63. For example, Ms. Hladik contacted Credit Karma and informed it that she had never opened a Credit Karma account.

64. After this conversation, Credit Karma continued to provide Ms. Hladik's personal credit information to her ex-husband.

65. As a result, Credit Karma violated 15 U.S.C. § 1681b(a) by releasing reports without an FCRA permissible purpose for doing so.

66. As a result of Credit Karma's conduct, Ms. Hladik suffered concrete injuries, including invasion of privacy and emotional distress.

67. Credit Karma's violation of 15 U.S.C. § 1681b(a) was willful, rendering it liable under 15 U.S.C. § 1681n. In the alternative, Credit Karma was negligent, entitling Ms. Hladik and the putative class members to recover under 15 U.S.C. § 1681o.

68. Ms. Hladik and each class member are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Credit Karma under 15 U.S.C. § 1681n.

**COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. §1681b(f)**

33. Ms. Hladik restates each of the preceding allegations.

34. **The Impermissible Access Class**. Under Fed. R. Civ. P. 23, Ms. Hladik brings this action individually and on behalf of a class initially defined as:

> All natural persons residing in the United States who (1) were the subject of a consumer report obtained by Credit Karma within five years before the filing of this action; (2) where the consumer had either previously informed Credit Karma that they had not opened a Credit Karma account or had not otherwise given Credit Karma authorization to access their credit information.

35. **Numerosity**. Ms. Hladik alleges that the Impermissible Access Class is so numerous that joinder of the claims of all class members is impractical. Credit Karma has more than 140 million users. The names and addresses of the class members are identifiable through

documents maintained by Credit Karma, and the class members may be notified of the pendency of this action by publication or mailed notice.

36. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Credit Karma had reason to believe that requests for credit reports through disputed consumer accounts had a legitimate FCRA permissible purpose; (b) whether this conduct constituted a violation of the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of Ms. Hladik and the putative class members.

37. **Typicality**. Ms. Hladik's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Ms. Hladik, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. § 1681b(f). This claim challenges the procedures of Credit Karma and does not depend on any individualized facts. For purposes of class certification, Ms. Hladik seeks only statutory and punitive damages. The recovery of class statutory and punitive damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but difficult to quantify. In addition, Ms. Hladik is entitled to the relief under the same causes of action as the other putative class members.

38. **Adequacy**. Ms. Hladik will fairly and adequately protect the interests of the class. She has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Ms. Hladik nor her counsel have any interests that might

cause her not to vigorously pursue this action. Ms. Hladik is aware of their responsibilities to the putative class and has accepted those responsibilities.

39. Certification of the class and under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the class and subclass predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Credit Karma's conduct, using individual prosecution to obtain the statutory and punitive damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Credit Karma's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

40. Credit Karma violated 15 U.S.C. § 1681b(f) by obtaining and using Ms. Hladik's and the putative class members' consumer reports without a permissible purpose to do so.

41. As a result of Credit Karma's conduct, Ms. Hladik suffered concrete injuries, including invasion of privacy and emotional distress.

42. Credit Karma's violation of 15 U.S.C. § 1681b(f) was willful, rendering it liable under 15 U.S.C. § 1681n. In the alternative, Credit Karma was negligent, entitling Ms. Hladik and the putative class members to recover under 15 U.S.C. § 1681o.

43. Ms. Hladik and each class member are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Credit Karma under 15 U.S.C. § 1681n.

## COUNT THREE: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. §1681e(a)

33. Ms. Hladik restates each of the preceding allegations.

34. **The Inadequate Procedures Class**. Under Fed. R. Civ. P. 23, Ms. Hladik brings this action individually and on behalf of a class initially defined as:

> All natural persons residing in the United States who (1) were the subject of a consumer report furnished by Credit Karma to a third party within five years before the filing of this action; (2) where the consumer had previously informed Credit Karma that they had not opened a Credit Karma account.

35. **Numerosity**. Ms. Hladik alleges that the Inadequate Procedures Class is so numerous that joinder of the claims of all class members is impractical. Credit Karma has more than 140 million users. The names and addresses of the class members are identifiable through documents maintained by Credit Karma, and the class members may be notified of the pendency of this action by publication or mailed notice.

36. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions

predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Credit Karma maintained reasonable procedures designed to prevent the disclosure of credit information only to users with a permissible purposed under the FCRA; (b) whether this conduct constituted a violation of the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of Ms. Hladik and the putative class members.

37. **Typicality**. Ms. Hladik's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Ms. Hladik, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. § 1681e(a). This claim challenges the procedures of Credit Karma and does not depend on any individualized facts. For purposes of class certification, Ms. Hladik seeks only statutory and punitive damages. The recovery of class statutory and punitive damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but difficult to quantify. In addition, Ms. Hladik is entitled to the relief under the same causes of action as the other putative class members.

38. **Adequacy**. Ms. Hladik will fairly and adequately protect the interests of the class. She has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Ms. Hladik nor her counsel have any interests that might cause her not to vigorously pursue this action. Ms. Hladik is aware of their responsibilities to the putative class and has accepted those responsibilities.

39. Certification of the class and under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the class and subclass predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Credit Karma's conduct, using individual prosecution to obtain the statutory and punitive damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Credit Karma's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

40. Credit Karma violated the FCRA, 15 U.S.C. §1681e(a) by furnishing Ms. Hladik's and the putative class members' consumer reports to unauthorized users without a permissible purpose to do so and by failing to maintain reasonable procedures to limit to furnishing of consumer reports to the purposes listed under §1681b.

41. As a result of Credit Karma's conduct, Ms. Hladik suffered concrete injuries, including invasion of privacy and emotional distress.

42. Credit Karma's violation of 15 U.S.C. § 1681e(a) was willful, rendering it liable under 15 U.S.C. § 1681n. In the alternative, Credit Karma was negligent, entitling Ms. Hladik and the putative class members to recover under 15 U.S.C. § 1681o.

43. Ms. Hladik and each class member are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Credit Karma under 15 U.S.C. § 1681n.

WHEREFORE, Ms. Hladik ask for judgment against Credit Karma, for class certification as pleaded, for statutory and punitive damages for herself and each putative class member, for attorneys' fees and costs, and for any other relief that that Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**COURTNEY HLADIK**

By *_/s/ Kristi C. Kelly_*
Counsel

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew Rosendahl, VSB #93738
KELLY GUZZO, PLC
3925 Chain Bridge, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
E-mail: kkelly@kellyguzzo.com
E-mail: aguzzo@kellyguzzo.com
E-mail: casey@kellyguzzo.com
E-mail: pat@kellyguzzo.com
E-mail: matt@kellyguzzo.com
*Counsel for Plaintiff*